

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-29-2007

# Green v. NJ State Pol

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-4111

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Green v. NJ State Pol" (2007). *2007 Decisions.* Paper 523.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/523

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4111
_____

AUNDREY L. GREEN


v.


NEW JERSEY STATE POLICE; JOSEPH J. SANTIAGO;
TROOPER ROBERT PARRY; CRAIG BROWN; FREDERICK FIFE;
JOHN N. SCHUSLER; GIULIANO, TROOPER, jointly & severally

Robert Parry, Craig Brown,
Frederick Fife and Trooper Salvatore Guliano,

Appellants.
_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 04-cv-00007)
District Court Judge: Honorable Joseph E. Irenas


_____


Submitted Under Third Circuit L.A.R. 34.1(a)
June 29, 2007

BEFORE: BARRY, FUENTES, and GARTH, <u>Circuit Judges</u>.


(Filed August 29, 2007)

OPINION OF THE COURT

FUENTES, Circuit Judge.

Aundrey Green claims that four New Jersey state troopers used excessive force after they arrested him for driving under the influence of alcohol and providing them with a false name. In ruling on defendants' motion for summary judgment, the District Court denied the troopers' claim that they were entitled to qualified immunity. This appeal followed, and we will affirm for the following reasons.

**I.**

The parties dispute many of the relevant facts in this case. Because we are reviewing a summary judgment ruling, we must view the facts in the light most favorable to Green, the party who opposed summary judgment. See Scott v. Harris, 127 S. Ct. 1769, 1774-75 (2007); Couden v. Duffy, 446 F.3d 483, 489 n.1 (3d Cir. 2006).[1]

Late at night, on April 22, 2002, Green was driving home with his girlfriend Alice McCoy and her two children when he was pulled over for speeding by New Jersey state

_____

[1] In the record, we have the benefit of two videotapes which capture many of the events at issue in this litigation. We have relied on the videotapes, where possible, to state the facts of this case. See Scott, 127 S. Ct. at 1776 ("The Court of Appeals . . . should have viewed the facts in the light depicted by the videotape."). Unlike in Scott, however, the videotape evidence is inconclusive on several of the key disputed facts.

troopers Robert Parry and Frederick Fife. Green did not have a driver's license or any other identification, and provided a false name to the officers. Later tests revealed that his blood alcohol level was over the legal limit and that he had marijuana in his system.

After asking Green to get of out of the car, the troopers continued speaking to him and asking questions. Meanwhile, troopers Salvatore Giuliano and Craig Brown arrived in a separate car. Eventually, Parry placed Green under arrest, handcuffed him, and searched him. Parry then walked Green to his patrol car and placed him in the back seat. When Parry entered the front of the car, Green began to complain that he had to use a bathroom immediately. Parry told him that he would have to wait until they got to the police station, and Green, growing increasingly agitated, continued to implore Parry to allow him to urinate. Green then began to curse and yell at Parry when he noticed that the other troopers had asked his girlfriend to step out the car he had been driving.

At some point, Green was able bring his handcuffs in front of his body. Green told Parry that he was going to urinate in the car and unzipped his pants, and Parry then heard a banging sound on the plastic divider between the back and front seats.[2] Parry immediately walked around the car and opened the rear door. Without first asking Green to exit the vehicle, Parry, according to Green, violently grabbed his neck and throat,

---

[2] Parry has stated that when he heard the banging sound, he looked back and saw that one of Green's hands was no longer in the handcuffs. App. 56-57. According to Parry, he was able to re-secure the handcuffs within a few seconds of first trying to pull Green out of the vehicle. App. 72-73. Green, by contrast, has claimed that neither of his hands were released from the handcuffs at any point after his arrest. App. 166.

3

choking him.[3] While struggling to pull Green out, Parry commanded him to get out of the car, but Green refused.

Soon after, Fife came over and twice sprayed Green with either mace or pepper spray, which made it difficult for him to see or speak. Parry, Fife, and another trooper repeatedly commanded Green to exit the vehicle and tried to pull him out. Green resisted by wedging his feet under the front seat and pushing himself away from the officers towards a partition that divided the back seat. As the struggle ensued, both Parry and Fife punched and kicked Green several times. Green has stated that he was punched in the face—suffering a swollen eye and a "busted" nose and mouth—and kicked in the ribs as well as other parts of his body. Green has also asserted that Fife twice hit him in the head with a flashlight, causing him to bleed from resulting lacerations.[4]

Eventually, the officers were able to extract Green from the car. They threw him to the ground, and, according to Green, kneed him in the back, and kicked him in the ribs and buttocks.[5] The troopers then called for an ambulance, which took Green to the hospital where he was treated for two lacerations on his head (requiring three stitches)

---

[3] Parry has disputed this account, claiming instead that he grabbed Green's arm or outer clothing. App. 58-59. Unfortunately, the videotapes are not conclusive on this factual issue.

[4] Fife has stated that he used the flashlight to strike Green on his wrists in an effort to dislodge his grip in the car. App. 123. The videotapes do not provide a clear enough picture to determine where Green was struck.

[5] On the second videotape, one can see Green pulled from the vehicle, but he and the officers then immediately move offscreen.

and an abrasion on his leg. Although Green has maintained in this litigation that he never hit any of the officers, he pleaded guilty to aggravated assault in state court and admitted that he kicked or struck two of the officers.

Under a number of theories, Green sued the New Jersey State Police, the four troopers involved in the incident, and John N. Schusler, a state trooper who conducted an internal investigation that did not result in any discipline. The defendants moved for summary judgment, which the District Court granted with the exception of Green's Fourth Amendment claim that the four troopers used excessive force. The District Court held that a "reasonable jury could find that the officers' actions were objectively unreasonable under the circumstances" and that "[t]he constitutional rights in question were clearly established." App. 18-19.

## II.

When a defendant claiming qualified immunity files an interlocutory appeal, the Supreme Court has held we do not have jurisdiction to review "a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson v. Jones, 515 U.S. 304, 319-20 (1995). We do have jurisdiction, however, "to review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right." Ziccardi v. City of Philadelphia, 288 F.3d 57, 61 (3d Cir. 2002); see also Rivas v. City of Passaic, 365 F.3d 181(3d Cir. 2004). Therefore, we will review the troopers' appeal to the extent it raises the latter question.

## III.

When examining whether officers are entitled to qualified immunity, "the first inquiry must be whether a constitutional right would have been violated on the facts alleged." Saucier v. Katz, 533 U.S. 194, 200 (2001). "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" Scott, 127 S. Ct. at 1774 (quoting Saucier, 533 U.S. at 201). We consider these two questions in turn.

## A.

The Supreme Court has stated that the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." Saucier, 533 U.S. at 202. We must evaluate the reasonableness of "a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," while recognizing "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." Graham v. Connor, 490 U.S. 386, 396-97 (1989). The Supreme Court has stated that courts should consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. We have also provided other relevant factors, such as "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be

6

armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997).

We agree with the District Court that, viewing the facts in the light most favorable to Green, a reasonable jury could conclude that the troopers' use of force was excessive under the circumstances. We do not mean to suggest that the troopers in fact acted unreasonably or that police officers are not permitted to use force when attempting to extract an arrestee from a police vehicle when that arrestee has refused to exit. Indeed, were we to accept the troopers' version of events in this case, we would likely agree with them that no constitutional violation occurred.

Green, however, has alleged three key facts that, if believed, could lead a reasonable jury to conclude that the officers used excessive force. First, Green has stated that Parry violently grabbed his throat before asking him to exit the vehicle. Second, Green has claimed that Fife twice hit him on the head with a flashlight, causing lacerations that required stitches. Finally, Green has maintained that after he was pulled from the car, he was thrown to the ground, kneed, and kicked several times. These allegations, none of which are either established or definitively refuted by the videotapes, present issues of material fact that must be resolved by a jury.

Applying the Graham and Sharrar factors, we believe these actions, if proven, would constitute excessive force. Green was arrested for a nonviolent offense and was unarmed. Although Green was agitated and had brought his handcuffs forward, an action certainly justifying a physical response from the police, it would not have been reasonable

7

for Parry to violently grab his neck without first using lesser force. Similarly, although

the officers were justified in using force to extract Green once he refused to exit,[6] it would

not have been reasonable for Fife to strike him on the head twice with a flashlight.[7]

Finally, if he was restrained on the ground after being pulled from the car, it would not

have been reasonable for the officers to continue kicking him.[8]

_____

[6] In his analysis, our dissenting colleague asks how we would remove Green from the vehicle. We have stated, however, that the officers were justified in using force; indeed, if the officers' account of events is true, they *were* able to pull Green out the car without resorting to the alleged actions that we conclude would have been unreasonable.

[7] Fife has stated that because he did not know how thoroughly Parry had previously searched Green, he believed that Green might have been trying to reach for a weapon in his pants. App. 90. We believe this fear was reasonable, but even Fife, as noted below, has admitted that striking Green on the head with the flashlight would have been excessive. The Attorney General has not cited to any evidence or testimony in the record suggesting that Parry or the other troopers also believed Green might be reaching for a weapon.

[8] The Attorney General argues that by pleading guilty to aggravated assault, Green has implicitly acknowledged that the officers did not use excessive force. As a result, according to the Attorney General, Green's claim is barred by Heck v. Humphrey, 512 U.S. 477 (1994). The District Court did not address this argument because it was not raised below. In briefing before the District Court, the Attorney General discussed Green's assault plea to refute his malicious prosecution claim, but did not mention it when challenging his excessive force assertions. In fact, the Attorney General even specifically stated in its reply papers that it was not arguing that Green's guilty plea precluded his excessive force claim. As we have noted before, "[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument." Brenner v. Local 514, United Bhd. of Carpenters & Joiners, 927 F.2d 1283, 1298 (3d Cir. 1991).

     In any event, it is doubtful that Green's excessive force claim would be barred by Heck. See Nelson v. Jashurek, 109 F.3d 142, 146 (3d Cir. 1997) (noting in an excessive force case that although it would "be difficult for [the plaintiff] to establish liability . . ., we do not see why a judgment in his favor would throw the validity of his conviction [for resisting arrest] into doubt"); Dyer v. Lee, 488 F.3d 876 (11th Cir. 2007) (rejecting the argument that Heck bars an excessive force claim under facts similar to those in this

**B.**

Having determined that a reasonable jury could find a constitutional violation based on the alleged facts, we next consider whether Green's rights in this specific context were "clearly established." To conclude that a right is "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. Officers who make reasonable mistakes as to what the law requires are entitled to qualified immunity, which "operates . . . to protect officers from the sometimes hazy border between excessive force and acceptable force." Id. at 206 (internal quotation marks omitted).

In the context of excessive force claims, we have relied on the factors set forth in Graham and Sharrar in evaluating whether an officer made a reasonable mistake. See Estate of Smith v. Marasco, 430 F.3d 140, 149-150 (3d Cir. 2005); Couden v. Duffy, 446 F.3d 483, 497 (3d Cir. 2006). We have stated that these factors "are well-recognized," Couden, 446 F.3d at 497, and that when an officer applies them in "an unreasonable manner, he is not entitled to qualified immunity." Estate of Smith, 430 F.3d at 150.

---

case). We agree with Green that his admission that during the struggle he came "in contact either by striking or kicking two of the officers," App. 288, would not, as a matter of logic, necessarily conflict with a finding of excessive force.

9

We agree with the Attorney General that there is no "case law holding that police officers cannot use force against a subject in an attempt to subdue him or remove him from a vehicle in which he has wedged himself." Appellant's Br. at 33. We believe, however, that a reasonable officer would know, based on the <u>Graham</u> and <u>Sharrar</u> factors, that it would be excessive to grab and choke an arrestee's throat, especially before using lesser force; to hit him on the head twice with a flashlight; and to kick him when he is already restrained and on the ground. Fife, to his credit, even acknowledged that striking Green on the head with a flashlight would have been "inappropriate," and would have constituted excessive force, App. 118-19; he explained, in fact, that such an action could constitute "deadly force." Supp. App. 30.[9] Because it would be unreasonable for officers to believe these actions would not constitute excessive force, we hold that Green's rights were "clearly established."

## IV.

We reiterate that we must accept Green's allegations, to the extent they do not

---

[9] In <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004), the Supreme Court noted that the factors set out in <u>Graham</u> are "cast at a high level of generality," but that in "an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." Subsequent to <u>Brosseau</u>, we have continued to apply the <u>Graham</u> and <u>Sharrar</u> factors to evaluate whether rights are clearly established. <u>See, e.g.</u>, <u>Estate of Smith</u>, 430 F.3d at 151-53. We agree with the dissent that the exact level of force officers may use in extracting an arrestee from a car is not clearly established. We believe, however, that it would have been "obvious" to the troopers that <u>Graham</u> and <u>Sharrar</u> prohibit the three alleged actions we have highlighted. Indeed, at no point have defendants even argued that the officers could have believed such actions were acceptable or reasonable.

10

conflict with the videotapes, as true.  Of course, the ultimate truthfulness of his

allegations is for a jury to determine.  For the reasons stated above, we will affirm.

GARTH, <u>Circuit</u> <u>Judge</u>, dissenting.

The overarching question that this appeal has left me with is: where, how, and when were Green's rights in this situation "clearly established"?  How would a reasonable police officer have known that he, and his colleagues, could not have removed Green as they did from the backseat of a police vehicle, when Green, who was under the influence of drugs and alcohol and who ultimately had to be sedated and restrained, physically resisted his removal?  The majority opinion has not answered this question. Fortunately, however, the Supreme Court has.  In *Brosseau v. Haugen*, 543 U.S. 194 (2004), the Supreme Court has furnished us with guiding principles for the determination of when a course of an officer's conduct qualifies for immunity.

Even if I were to assume that the officers' actions in the instant case could possibly have reached the level of excessive force–a position I do not take–it is evident here that the officers' actions fell into that "hazy border between excessive force and acceptable force," so that it was by no means clearly established that their conduct violated the Fourth Amendment.  *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  Accordingly, I respectfully dissent from the majority's opinion, as the officers here are clearly entitled to qualified immunity.

I.

In order to deny an official qualified immunity, a court must engage in two levels of analysis. The first is a finding that a constitutional right was violated. The second is whether the plaintiff's rights, in this case Green's rights, were clearly established. I focus here on this second level, for nowhere in the District Court's opinion or in the majority's opinion or in any case, statute, regulation, or custom have we been informed that police officers cannot remove a resisting arrestee from a police vehicle in the manner in which these officers removed Green. Although "there does not have to be a precise factual correspondence between the case at issue and a previous case in order for a right to be clearly established," *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004), I believe that the majority has conceived of the right here at issue at too "high [a] level of generality" to be useful in a case that presents this entirely novel fact pattern. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (finding that the test for excessive force as set out in *Graham v. Connor*, 490 U.S. 386 (1989), was too general to be the sole reference point for whether a right was clearly established in a non-obvious case).

A right is clearly established if, "in the *specific context of the case*," *Saucier*, 533 U.S. at 201 (emphasis added), the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Atkinson v. Taylor*, 316 F.3d 257, 261 (3d Cir. 2003) (quoting *Anderson v. Creighton*, 483 U.S. 465, 640 (1987)). In other words, "[t]he relevant, dispositive inquiry . . . is whether it would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (emphasis added). As the Supreme Court has

13

explained,

> An officer might correctly perceive all of the relevant facts but have a
> mistaken understanding as to whether a particular amount of force is legal
> in those circumstances.  *If the officer's mistake as to what the law requires*
> *is reasonable, however, the officer is entitled to the immunity defense.*

*Id.* at 205 (emphasis added).  *See also Tofano v. Reidel*, 61 F. Supp. 2d 289, 304 (D.N.J. 1999) (Barry, District J.) (stating that "if reasonable officers could believe that a certain course of conduct is unlawful but other reasonable officers could believe that the conduct was lawful, qualified immunity attaches.").

## II.

This court has, in the past, used the factors listed in *Graham v. Connor*, 490 U.S. 386 (1989), and *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997), to delineate the "contours of the right" to be free from excessive force.  *See, e.g.,  Estate of Smith v. Marasco*, 430 F.3d 140, 149-50 (3d Cir. 2005) (using the *Graham*/*Sharrar* factors to find that the right at issue was not clearly established).  Those factors, which must guide an officer determining the appropriate level of force to employ, include:

> the severity of the crime at issue, whether the suspect poses an immediate

14

threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight . . . [whether] the

persons subject to the police action are themselves violent or dangerous, the

duration of the action, whether the action takes place in the context of

effecting an arrest, the possibility that the suspect may be armed, and the

number of persons with whom the police officers must contend at one time.

*Sharrar*, 128 F.3d at 821-22 (internal quotations omitted).  I cannot agree that these

officers applied these factors in an unreasonable manner.  Furthermore, even if, as the

majority believes, the officers did use excessive force here, it is not "clearly established"

that the *Graham*/*Sharrar* factors are appropriately specific to the facts such that they

would put the officers on notice that their actions were unlawful.

The majority's conclusion that the officers unreasonably applied the

*Graham*/*Sharrar* factors is based on three of Green's factual allegations.  The majority

contends that it would be excessive force, and, more importantly for this discussion, that

reasonable officers would know that it was excessive force, for the officers to: (1) grab

Green by the throat; (2)  hit him on the head twice with a flashlight; and (3) kick him after

he had been extracted from the car.

Accepting as true Green's version of the disputed facts, as I must under our

standard of review, I still cannot conclude that any reasonable officer would know that

this conduct was excessive.  Green, seated in the back of the police car, was drunk,

15

threatening to urinate in the back of the vehicle, and was cursing and yelling. It is undisputed that Green was aggressive and combative. *See* App. 57 ("[Green's] level of aggression and his demeanor escalated. He was more combative . . . ."). Officer Parry heard a banging on the plexiglass divider between the front and back seats, and discovered that Green, who was "screaming, kicking, [and] yelling," had gotten his handcuffs in front of his body. Parry was concerned "for [Green's] safety and mine." App. 59; Supp. App. 24 ("he could have injured me with his cuffs."). He believed a physical response was necessary, as Green was agitated and had not been responsive to Parry's verbal attempts to pacify him. App. 57; Supp. App. 24.

According to Green, Parry grabbed Green by the neck and tried to pull him out of the car. Parry then repeatedly told Green to get out of the car, but Green would not. Officer Fife sprayed Green with mace or pepper spray. As the videotape reveals and as Green admits, the officers then backed away from the car door and asked Green if he was going to get out of the car or continue to resist. App.184. Despite this opportunity to end the confrontation, Green still refused to exit. Instead, he wedged his feet under the front seat of the car and braced his head and shoulders against the partition dividing the back seat. Officers Parry and Fife then punched and kicked him to try to extricate him from the car, but to no avail. Having tried verbal orders to come out of the car, attempts to pull him out of the car, and pepper spray, Green now alleges that Officer Fife twice hit Green

16

in the head with a flashlight.[10]  The officers were finally able to pull Green out of the car.  The officers, according to Green, threw him to the ground, kneed him in the back, and kicked him.[11]

Green was then transported to the hospital.  The medical staff reported that Green was combative–yelling, swearing, and biting at the staff–requiring that he be placed in four-point restraints and sedated with Ketamine and later, Haldol.

In this context, how can it be that the officers unreasonably applied the *Graham*/*Sharrar* factors?  Green, who was under the influence of alcohol and drugs and may have been mentally disturbed (as witnessed by  his ultimate sedation and four-point restraint), was threatening to urinate in the back of the car and posed a threat to the officers.  Officer Parry said he was afraid Green would injure him and Officer Fife was worried Green had a hidden weapon.  Green did not initially resist being handcuffed, but he *was* resisting removal.  And, he repeatedly refused to follow the officers' reasonable orders to get out of the car.  As the majority concedes, the use of force here was not inappropriate.  *See* maj. op. p.7.  But how much force is on the acceptable side of that "hazy border between excessive force and acceptable force," where the person subject to

---

[10]Although we must accept as true Green's statement that he was struck in the head with a flashlight, Officer Fife maintains that he used the flashlight to strike Green on his wrists.  App. 123.  Moreover, even if Green's injuries did come as a result of being hit on the head with a flashlight, the injuries were slight.

[11]The videotape is clear that three officers were struggling to pull Green out of the car as best they could.  Although Green claims that once out of the car, he was kneed in the back and kicked, the videotapes do not show anything subsequent to Green's removal from the vehicle.

the police action is arrested and handcuffed, yet still in somewhat of a position of advantage over the officers?

The majority says that it would certainly be clear to a reasonable officer that the force Green describes was excessive. I, on the other hand, conclude that a reasonable officer could think he was using only that force which was necessary to protect himself, extract Green from the car, and subdue him. If I may ask the majority: how would they extricate an individual from a car when he is under the influence of alcohol and drugs, aggressive, mentally disturbed, combative, and has resisted all entreaties and urging? Would my colleagues entice him with drugs, money, beguiling songs, alcohol—or would they let him remain in the vehicle as long as he desires, even though he requires medical attention?

III.

A recent Supreme Court case involving far more egregious and excessive force circumstances than we encounter here, informs my conclusion that the officers here have qualified immunity. In *Brosseau v. Haugen*, 543 U.S. 194 (2004), Kenneth Haugen brought a claim for excessive force against Officer Rochelle Brosseau. The facts here are instructive. A former crime partner of Haugen's reported to Officer Brosseau that Haugen had stolen some tools from his shop. The officer also learned that there was a

18

felony no-bail warrant out for Haugen's arrest on drug and other offenses. When Officer

Brosseau located Haugen, Haugen fled on foot. Officer Brosseau and two other officers

searched for him throughout the neighborhood. The officers instructed the people in the

near vicinity to stay in their vehicles. After approximately 30 to 45 minutes, Haugen

reappeared and jumped into the driver's seat of his car. He closed and locked the door.

Officer Brosseau said she believed Haugen might be trying to retrieve a weapon. *Id.* at

195-95.

Officer Brosseau arrived at the car, pointed her gun at Haugen, and ordered him to

get out of the car. He ignored her, and instead looked for his car keys so he could start

the vehicle. After Haugen continued to ignore her commands to exit the car, Officer

Brosseau hit the driver's side window with her handgun several times, shattering it. After

unsuccessfully trying to grab the car keys, the officer hit Haugen on the head with the

barrel and butt of her gun. Haugen was nevertheless able to start the engine. Officer

Brosseau jumped back and to the left, and fired one shot through the rear driver's side

window. The shot hit Haugen in the back. Haugen sustained a collapsed lung, and later

pled guilty to the felony of "eluding." *Id.* at 196-97.

Officer Brosseau said that she fired her gun because she was afraid for the safety

of the officers on foot—who had been last seen two houses away, for the safety of the

people in the occupied vehicles, and for the safety of anyone else who might be in

Haugen's path. *Id.* at 197.

The Supreme Court, while expressing no opinion on constitutional question of

19

whether Officer Brosseau had used excessive force, reversed the Ninth Circuit's decision which had denied Officer Brosseau's motion for qualified immunity. The Court found that Brosseau was entitled to qualified immunity because Haugen's rights *had not been clearly established* at the time of the confrontation. *Id.* at 198.

The Court found error in the fact that the Ninth Circuit had relied on "the general tests set out in *Graham* and [*Tennessee v.*] *Garner*"[12] to find that Officer Brosseau had "fair warning" that her use of deadly force in this situation was unlawful. *Id.* at 199. The Court remarked that the "present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." *Id.* Reviewing the caselaw, the Court concluded that "this area is one in which the result depends very much on the facts of each case." *Id.* at 201. Accordingly, Brosseau's actions fell within that "hazy border between excessive and acceptable force," entitling her to qualified immunity. *Brosseau*, 543 U.S. at 201 (quoting *Saucier*, 533 U.S. at 206).

*Brosseau* makes it abundantly clear that the actions of Officer Parry and his colleagues fall, as well, into that "hazy border" which the Supreme Court found qualified Officer Brosseau for immunity. I am aware of no case that establishes Green's rights in this situation at the "'particularized'" level that the Supreme Court has instructed is necessary. *Brosseau*, 543 U.S. at 199 (quoting *Saucier*, 533 U.S. at 202). This is not a case about the amount of force that can be used to handcuff a person resisting arrest. *See*

---

[12]47 U.S. 1 (1985).

*e.g., Cruz v. City of Wilmington*, 814 F. Supp. 405, 413 (D. Del. 1993) (finding that where arrestee "repeatedly refused to follow the officers' directions while both inside and outside the vehicle," alleged conduct of officers in pulling him from car and twisting his arm in order to handcuff him was not excessive force).  Nor is it a case about gratuitous violence on a handcuffed and compliant arrestee. *See e.g., Sanders v. Workman*, No. 97-694, 2001 WL 656072, at *2 (D. Del. Mar. 26, 2001) (finding allegations sufficient to support claim of excessive force where plaintiff, who did not resist arrest, alleged officer handcuffed him then assaulted him by pushing, shoving, and pressing thumb into his head).

Rather, the "particularized" right at issue here is: whether to use force, including kicks and two blows to the head, to extricate from a police vehicle a drunk and high-on-drugs arrestee who has been handcuffed, but remains aggressive, has brought his hands in front of him and therefore poses a threat to the officers, will not comply with orders to exit the car, and is about to urinate in the backseat.  The majority opinion provides no advice or hint as to what a reasonable officer can or should do in circumstances like Green's.  Nor does it tell us where we should look to ascertain any standard procedure for extricating such an individual from a police vehicle.  Of even greater importance, the majority has not told us where it is "clearly established" that police officers, such as Parry, Fife, and their colleagues, cannot conduct themselves as these officers did, and as the video shows them doing.  Just as Officer Brosseau was not on notice that her use of force–which in that case was deadly–was excessive, so too can the officers who sought to

21

remove Green from the police car not be said to have known that the actions they took were "clearly established" as violating Green's rights.

Because the police officers' actions constituted acceptable conduct in the removal of Green from the vehicle, and because any violation of Green's Fourth Amendment rights had not been clearly established–and the majority has not demonstrated otherwise, I respectfully dissent and would grant the officers' summary judgment motion upholding their qualified immunity.[13]

---

[13]See also my dissent and concurrence in *Brown v. Muhlenberg Twp.*, which discusses the clearly established prong of qualified immunity, albeit in a different context. *Brown v. Muhlenberg Twp.*, 269 F.3d 205 (2001) (Garth, J., concurring and dissenting).